*United States v. Archer*

# In the
# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2019
Docket No. 18-3727

UNITED STATES OF AMERICA,
*Appellant*,

v.

DEVON ARCHER,
*Defendant-Appellee*,

JASON GALANIS, GARY HIRST, JOHN GALANIS, AKA YANNI, HUGH DUNKERLEY,
MICHELLE MORTON, BEVAN COONEY,
*Defendants*.*

ARGUED:  November 18, 2019
DECIDED:  October 7, 2020

Before:     WALKER, SULLIVAN, *Circuit Judges*,
NATHAN, *District Judge*.†

---

* The Clerk of the Court is directed to amend the caption as set forth above.
† Judge Alison Nathan, of the United States District Court for the Southern District of New York, sitting by designation.

The government appeals from an order of the United States District Court for the Southern District of New York (Ronnie Abrams, *J.*) granting Defendant Devon Archer's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, following Archer's conviction for conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and securities fraud, in violation of 15 U.S.C §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. Because the weight of the evidence presented at trial did not preponderate heavily against the jury's verdict, we find that the district court abused its discretion in vacating the judgment and granting a new trial. Accordingly, the decision of the district court is REVERSED, and the jury verdict is reinstated. The case is REMANDED to the district court for sentencing.

SARAH K. EDDY (Rebecca Mermelstein, Negar Tekeei, *on the brief*), Assistant United States Attorneys, *for* Audrey Strauss, Acting United States Attorney, *for Appellant*.

MATTHEW L. SCHWARTZ, Boies Schiller Flexner LLP, New York, NY, *for Defendant-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

The government appeals from an order of the United States District Court

for the Southern District of New York (Ronnie Abrams, *J.*) vacating Defendant-

Appellee Devon Archer's conviction and granting his motion for a new trial

pursuant to Federal Rule of Criminal Procedure 33. The operative indictment,

filed March 26, 2018, charged Archer with conspiracy to commit securities fraud,

in violation of 18 U.S.C. § 371, and securities fraud, in violation of 15 U.S.C §§ 78j(b)

and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  After a month-long trial, the jury

found Archer guilty on both counts.  On appeal, the government argues that the

district court abused its discretion in setting aside the jury's verdict under Rule 33

as against the weight of the evidence.  We agree.

## I. BACKGROUND

### A. Facts[1]

This case concerns a scheme engineered by Jason Galanis ("Galanis") and

others to defraud a tribal entity, the Wakpamni Lake Community Corporation of

the Oglala Sioux Tribe (the "Wakpamni"), of the proceeds of a series of bond

offerings worth approximately $60 million.  In doing so, the conspirators harmed

not only the Wakpamni but also several investors upon whom they foisted the

Wakpamni bonds – which had no secondary market – in order to generate cash

for their own personal use.

---

[1] "Because this is an appeal from a judgment of conviction entered after a jury trial, the . . . facts are drawn from the trial evidence and described in the light most favorable to the [g]overnment." *United States v. Litwok*, 678 F.3d 208, 210–11 (2d Cir. 2012).  Since a key component of Archer's defense at trial and his argument on appeal is his intent (or lack thereof), this section provides only a broad overview of the scheme, focusing primarily on the undisputed facts.  We discuss the details of Archer's role and what the jury could infer from the evidence regarding his knowledge and intent in the following section.

In early 2014, Jason Galanis, Archer, Bevan Cooney, and others were working together to acquire financial services companies that they could "roll up" into a large financial conglomerate with Archer at the helm. They began by investing in Burnham Financial Group ("Burnham"), a well-established financial services company with a prominent name that they sought to leverage in building their own conglomerate. But to purchase additional so-called "roll-up" companies, they needed capital.

So, in February 2014, Galanis informed Archer and Cooney that he had been "brought a deal" for tax-free bonds from the Ogala Sioux Tribe, to which the Wakpamni belonged. App'x 848. The next month, John Galanis, Jason Galanis's father, met with a representative from the Sioux Tribe and convinced the Wakpamni to issue a series of bonds, promising that the proceeds from the sale of these bonds would be placed into an annuity. The Wakpamni understood that the annuity "would be like an insurance wrapper that would protect the principal investment and generate annual income to cover the interest on the bonds as well as generate income for" the Wakpamni's economic development projects. Tr. 1836; *see also* Tr. 1850. The scheme had an air of legitimacy: John Galanis represented to the Wakpamni that Wealth Assurance-AG, a legitimate insurance

4

company that Archer, Cooney, Jason Galanis, and others had acquired, would be the annuity provider. The transaction documents, however, listed Wealth Assurance Private Client Corp. ("WAPC"), a shell entity that John Galanis falsely represented to be a subsidiary of Wealth Assurance-AG, as the annuity provider. In June 2014, one of Archer's co-defendants opened a bank account in the name of WAPC (the "WAPC account") and designated Hugh Dunkerley, another of Archer's eventual co-defendants, as a signatory of that account. Finally, John Galanis represented to the Wakpamni that Burnham Securities Inc., a legitimate registered broker-dealer, would serve as the "placement agent" responsible for "undertak[ing] due diligence on the bonds, do[ing] a lot of legal [work] putting together . . . the contracts[,] and then finally find[ing] investors for the bonds." Tr. 1005.

Once John Galanis set up the Wakpamni scheme, Jason Galanis, Archer, and others went about finding buyers for the bonds. A company with which Archer was affiliated financed the purchase of an investment adviser, Hughes Asset Management ("Hughes"), and Galanis installed another one of the co-defendants, Michelle Morton, as Hughes's CEO. In August 2014, based on John Galanis's promise that the proceeds would be invested in an annuity, the Wakpamni issued

5

their first set of bonds. Morton purchased the entire issue, worth $28 million, on behalf of Hughes's unsuspecting clients – without disclosing that the same individuals who induced the Wakpamni to issue the bonds also controlled Hughes and the purported placement agent. Placing the bonds in this manner, without investor knowledge or permission, also violated several of Hughes's clients' investor agreements. Most importantly, the bond proceeds were then placed into the WAPC account – not an annuity.

Unaware that the proceeds from the first bond offering had been diverted to the WAPC account and not invested in an annuity, the Wakpamni launched a second issuance the following month. This time around, Archer and Cooney collectively purchased $20 million worth of bonds from the Wakpamni – with Archer doing so through his real estate company, Rosemont Seneca Bohai LLC ("RSB") – using proceeds from the first offering that had been diverted to the WAPC account. After buying the bonds, Archer and Cooney used them to satisfy the net capital requirements of two other Archer-controlled companies, without disclosing that the bonds were purchased with the proceeds of an earlier bond issuance. The Financial Industry Regulatory Authority ("FINRA") would later

condemn Archer's use of the bonds in this way because the Wakpamni bonds had "no active market." Tr. 2097.

In April 2015, the Wakpamni issued their third and final set of bonds for $16 million. As with the first bond offering, Burnham Securities was selected as the supposed placement agent for the bonds. At around that same time, Archer and Cooney acquired a second investment adviser company, Atlantic Asset Management ("Atlantic"), which (like Hughes) was led by Morton. Ultimately, Morton and Atlantic arranged for the purchase of the entire $16 million in bonds by a single client of Atlantic, the Omaha School Employees Retirement System ("OSERS"). As with the first bond offering, Morton did not seek or receive approval from OSERS for the transaction, which did not align with its investment goals, nor did she inform OSERS of the inherent conflicts of interest that permeated the transaction.

Once again, instead of being used to purchase an annuity for the Wakpamni, as John Galanis had promised, the proceeds from the third bond issuance were diverted to the WAPC account, where they were used by various conspirators for their own personal benefit and interests. Some, like Jason Galanis and his father, used the bond proceeds to purchase "jewelry and luxury cars," Tr. 58, and a new

7

condo in New York City; others, like Archer and Cooney, used the bonds and the proceeds "to further their [own] schemes," Tr. 59, which included building "a big financial services company" that Archer was to control, Tr. 59–60.

In the fall of 2015, the Wakpamni scheme began to unravel when the first set of interest payments on the Wakpamni bonds became due. In September 2015, Archer transferred $250,000 from one of his companies to the WAPC account, which was then used to help pay the interest on the bonds from the first offering. Soon thereafter, Galanis was arrested on unrelated charges. In October 2015, some of the conspirators created a new entity named Calvert Capital ("Calvert") to cover up the scheme. As part of this effort, they fabricated backdated documents suggesting that WAPC invested in Calvert and that Calvert lent Cooney and Archer the $20 million to purchase the bonds from the second offering.

In the end, the Wakpamni were left with $60 million in debt, and the fund investors lost over $40 million.

## B. Procedural History

On March 26, 2018, the government filed the operative, superseding indictment charging Archer and four others with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 ("Count One"), and securities fraud, in

8

violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 ("Count Two"). Count One alleged that the Defendants conspired to defraud the Wakpamni by inducing them to issue bonds on the false promise that the proceeds would be invested into an annuity, which the Defendants instead misappropriated for their own use. It also charged the Defendants with conspiring to defraud Hughes's and Atlantic's clients by "gaining ownership and control" of those investment advisers "and causing client funds to be invested in the [Wakpamni] bonds, without disclosing the material facts to these clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed." App'x 136. Count Two accused the Defendants of substantive securities fraud for making false statements and omitting material facts while "engag[ing] in a scheme to misappropriate the proceeds of several bond issuances by the [Wakpamni]" and in "caus[ing] investor funds" of Hughes's and Atlantic's clients "to be used to purchase the bonds." App'x 134–56; *see also* Tr. 4146. Alternatively, Count Two alleged that the Defendants aided and abetted the securities fraud.

Four Defendants charged in the case – Jason Galanis, Gary Hirst, Hugh Dunkerley, and Michelle Morton – pleaded guilty prior to trial, with Dunkerley

doing so pursuant to a cooperation agreement with the government.[2] Archer proceeded to a jury trial along with two of his co-defendants, John Galanis and Bevin Cooney. A key issue at trial, which forms the basis of this appeal, was whether Archer, a businessman with connections to high-profile business and political leaders, was a knowing participant in the scheme or was simply a victim of Jason Galanis's fraud.

Trial commenced on May 22, 2018 and ended on June 28, 2018, at which time the jury convicted Archer, John Galanis, and Cooney on both counts. After trial, Archer and his trial co-defendants moved for acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Rule 33. The district court denied all motions except Archer's motion for a new trial. *See Galanis*, 366 F. Supp. 3d 477.

With respect to Archer's Rule 29 motion, the district court recognized that, "drawing every inference in the government's favor, as the [c]ourt is required to do under Rule 29, [it] [could not] conclude that no reasonable jury could have convicted [Archer], particularly because the primary issue was intent and the government presented a substantial amount of circumstantial evidence to that

---

[2] Jason Galanis was charged in the original indictment but pleaded guilty before the government filed the operative indictment.

10

effect." *Id.* at 492. Nevertheless, in addressing Archer's motion for a new trial pursuant to Rule 33, the district court concluded that while "[t]he government's reliance on circumstantial evidence is of course perfectly appropriate" and "the government's case against Archer is not without appeal at first blush[,] . . . when each piece of evidence in this indisputably complex case is examined with scrutiny and in the context of all the facts presented, the government's case against Archer loses much of its force." *Id.*

Concerned that Galanis deceived many of those around him, including those knowingly involved in his schemes, the district court determined, as a factfinder would do, "that Galanis viewed Archer as a pawn to be used in furtherance of his various criminal schemes." *Id.* The district court was further troubled "by the government's inability throughout trial to articulate a compelling motive for Archer to engage in this fraud," noting that "Archer never received money from the purported annuity provider, nor did he profit directly from the misappropriation of the bond proceeds." *Id.* And while the district court acknowledged that the government's theory regarding Archer's motive – his "admitted interest in the roll up being successful" – could not be "dismiss[ed] . . . entirely," it nevertheless concluded that this motive was not "compelling" and

11

was "mitigated" by the fact that Archer ultimately lost a significant portion of the funds that he himself had invested into the scheme. *Id.* at 492–93.

The district court stated that, because the evidence was subject to multiple interpretations, it "remain[ed] unconvinced that Archer knew that Jason Galanis was perpetrating a massive fraud." *Id.* 493. It emphasized "the unique considerations pertaining to [Archer's] relationship with Jason Galanis" – namely, what it saw as Galanis's efforts to keep Archer in the dark while simultaneously touting Archer's political and business connections – as well as "potential juror confusion over a government summary chart admitted as an exhibit." *Id.* at 505. The district court announced that, "when viewing the entire body of evidence, particularly in light of the alternative inferences that may legitimately be drawn from each piece of circumstantial evidence, . . . [it] harbor[ed] a real concern" that Archer did not have the requisite intent and was instead "innocent of the crimes charged." *Id.* at 507. The district court therefore granted Archer's Rule 33 motion and ordered a new trial. *Id.* The government timely appealed.

## II. STANDARD OF REVIEW

"We review the decision of the district court to grant a new trial for abuse of discretion." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). A district

12

court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *United States v. Forbes*, 790 F.3d 403, 406 (2d Cir. 2015).

## III. DISCUSSION

On appeal, the government argues that the district court abused its discretion in granting Archer's Rule 33 motion because the evidence did not "preponderate heavily against the verdict." Gov. Br. at 33. It further argues that in assessing the evidence, the district court inappropriately disregarded the jury's resolution of conflicting evidence and failed to consider the weight of the evidence in its entirety. We agree.[3]

### A. To Grant a Rule 33 Motion Based on the Weight of the Evidence Alone, the Evidence Must Preponderate Heavily Against the Verdict

Under Rule 33, "the court may grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. While we have held that a

---

[3] The government also contends that the district court failed to consider that Archer's guilty knowledge could be proved by conscious avoidance, as the jury was instructed. Because we hold that the district court applied the incorrect standard and that the jury was entitled to conclude that Archer knowingly participated in the scheme, we need not reach this argument.

district court may grant a new trial if the evidence does not support the verdict, we have emphasized that such action must be done "'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson*, 246 F.3d at 134 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). Nevertheless, we have not always been clear about what constitutes an "extraordinary circumstance" that can justify a district court's decision to overturn a jury's verdict. We now clarify that rule and hold that a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be "manifest injustice" to let the verdict stand. *See Sanchez*, 969 F.2d at 1414.

The "preponderates heavily" standard finds support in our decision in *Sanchez*, 969 F.2d 1409. There, we considered the district court's grant of a Rule 33 motion based on what the district judge considered to be perjured testimony. We first concluded that the district court erred in finding that several police officers committed perjury simply because their recollection of the events at issue differed. *Id.* at 1415. Since the testimony shared many consistent aspects, "the differences in testimony" presented, at most, "a credibility question for the jury." *Id.* But even discounting that testimony, we emphasized that "[i]t surely cannot be said . . . that

14

the evidence 'preponderate[d] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *Id.* (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985)).

The "preponderates heavily" standard is not limited to cases like *Sanchez* in which a district court, after discounting certain questionable evidence, must assess the weight of the remaining evidence supporting the conviction. It also applies with equal, if not stronger, force to cases in which a district court examines the weight of the evidence as a whole – all of which the jury reasonably and appropriately relied on in reaching its verdict. Our clarification that the "preponderates heavily" standard applies in such cases is in accord with the standard used by several of our sister circuits. *See United States v. LaVictor*, 848 F.3d 428, 455–56 (6th Cir. 2017) ("A motion for a new trial . . . is . . . granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." (internal quotation marks omitted)); *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997) ("The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."); *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992) (agreeing with the Eighth Circuit's conclusion that the district court, in granting a new trial

based on the sufficiency of the evidence, should look to whether the evidence "preponderates sufficiently heavily against the verdict" (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)); *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989) ("[T]his is not one of those 'exceptional cases' where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand."); *Martinez*, 763 F.2d at 1313 ("The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.").

We stress that, under this standard, a district court may not "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Robertson*, 110 F.3d at 1118; *see also Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1160 (8th Cir. 1999) (holding that a district court may not grant a new trial "simply because it believes other inferences and conclusions are more reasonable"). To the contrary, absent a situation in which the evidence was "patently incredible or defie[d] physical realities," *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414), or where an evidentiary or instructional error compromised the reliability of the verdict, *see id.* at 136–37, a district court must "defer to the jury's resolution of conflicting evidence," *United States v. McCourty*,

562 F.3d 458, 475–76 (2d Cir. 2009).  And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis.  *See, e.g., United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000).

Importantly, we do not find this standard to conflict with our holding in *Ferguson*.  In *Ferguson*, the district court not only explicitly applied the preponderates heavily standard that we adopt today, *see United States v. Ferguson*, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), *aff'd*, 246 F.3d 129 (2d Cir. 2001), it did so following a trial infected by several errors, none of which are present here.  In *Ferguson*, the defendant was convicted of committing a violent crime in aid of racketeering, which requires that one use or threaten violence for at least one of three possible purposes: (1) pecuniary gain, (2) "gaining entry" into an "enterprise," which in that case was a gang, or (3) "maintaining or increasing [one's] position" in that enterprise.  18 U.S.C. § 1959(a); *see Ferguson*, 246 F.3d at 134.  Although the district court instructed the jury as to all three possible motives, *Ferguson*, 49 F. Supp. 2d at 324, it recognized, in granting the defendant's Rule 33 motion, that there was legally sufficient evidence supporting only the pecuniary gain motive, *id.* at 327–30, and it was therefore "error to have charged on all three

of the motivational alternatives," *id.* at 324 n.5. The district court further explained that the only evidence supporting the pecuniary motive was the vague, suspect testimony of an interested witness, which alone was simply "too slender . . . to support a guilty verdict." *Id.* at 328–29. Moreover, the district court stated that its denial of Ferguson's motion to sever his trial from that of his co-defendants was reversible error alone, as it exposed the jury to "weeks of testimony regarding successful murders and assaults, none of which involved" the defendant. *Id.* at 330.

In short, *Ferguson* was an "exceptional" case warranting a new trial. *Ferguson*, 246 F.3d at 134–35. While we did not explicitly acknowledge that the evidence preponderated heavily against the verdict, the standard we laid out in *Ferguson* is not in tension with the "preponderates heavily" standard that we explicitly adopt today. Moreover, the factual circumstances underlying our decision in *Ferguson* are simply not present here.

In sum, while we review a district court's decision to grant a new trial based on the weight of the evidence for abuse of discretion – not a "more stringent standard of review," *id.* at 133 n.1 – the district court's discretion in such cases is

not without limit.  Instead, the "preponderates heavily" standard circumscribes that discretion, and provides much needed guidance to district courts.

**B.  The Evidence Here Did Not Preponderate Heavily Against the Verdict**

The evidence introduced at trial did not preponderate heavily against the jury's verdict.  In ruling on Archer's Rule 33 motion, the district court found that it "was clear that material misstatements and omissions were made in connection with the sale of securities," and therefore focused on "[t]he only seriously disputed element" – Archer's intent.  S. App'x 11.  For Count Two, the substantive securities fraud charge, this was whether Archer acted "[w]illfully" and with the "[i]ntent to defraud," Tr. 4153, 4161–62, or, in the event the jury found him guilty of aiding and abetting, whether he "willfully, knowingly associated himself in some way with the crime and that he willfully and knowingly would seek by some act to help make the crime succeed," Tr. 4159.  And with respect to Count One, the conspiracy charge, the government was required to prove Archer "willfully and knowingly became a member of the conspiracy, with intent to further its illegal purposes – that is, with the intent to commit the object of the charged conspiracy." Tr. 4165.  Thus, the government was required to show that Archer had "at least the degree of criminal intent necessary for the substantive offense itself," *United*

*States v. Feola*, 420 U.S. 671, 686 (1975), but was not required to show that he "knew all of the details of the conspiracy, so long as he knew its general nature and extent," *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (internal quotation marks omitted) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)).

In concluding that the evidence did not support the jury's finding, the district court relied on this Circuit's prior case law on the proper standard, which we are clarifying today. But when the facts of this case are assessed under the preponderates heavily standard outlined above, we are left with the unmistakable conclusion that the jury's verdict must be upheld.

1. The Promise of an Annuity and Misappropriation of Funds

During trial, the jury reviewed a wealth of emails in which Archer, Cooney, and Galanis discussed the progression of the Wakpamni scheme, which the government argued reflected Archer's knowledge of the scheme and intent to misappropriate the bond proceeds.

Throughout the first half of 2014, Galanis ensured that Archer stayed up to date on the deal with the Wakpamni, including by informing Archer that the proceeds from the sale of the bonds were supposed to be placed into an annuity. Yet Galanis also repeatedly emphasized that the proceeds from the bonds would

20

provide them with "discretionary liquidity" to use to further their financial empire. *See, e.g.*, App'x 862, 866. As the government argues, the idea that they could use bond proceeds however they chose stood in sharp tension with the conservative annuity investment that the Wakpamni were promised and about which Archer was fully apprised.

Nonetheless, in setting aside the jury's verdict, the district court found that this evidence did not reflect Archer's intent, contending that the language in the emails was "facially innocuous or, at best, most naturally subject to innocent interpretations." *Galanis*, 366 F. Supp. 3d at 495. But while much of the language in these emails, such as the term "discretionary liquidity," could be subject to both legitimate and nefarious interpretations, the jury did not "misinterpret[]" the emails in concluding the latter. *Id.* at 496. One email, the import of which the parties hotly disputed during oral argument, provides a key example: On July 20, 2014, Galanis sent Archer an email alerting him that "the indians signed . . . our engagement" and sending him the contact information of the lawyer advising the Wakpamni on the deal. App'x 786. Galanis instructed Archer that while there was "[n]othing for [Archer] to do at this point," it "may[ ]be good for [the Wakpamni's counsel] to know that you [(Archer)] are associated with the

21

insurance company at the right moment," which "might be nice icing on the cake."

*Id.* He further added that "[t]he use of proceeds is to place the bonds into a Wealth

Assurance annuity," which would then be "invested by an appointed manager on

a discretionary basis." *Id.* While the district court concluded that this email was

better read as "exculpatory because Galanis is specifically representing that the

bond proceeds would be placed in an annuity," *Galanis*, 366 F. Supp. 3d at 497, it

could also reasonably be read as Galanis providing tacit instructions to Archer

regarding their cover story. Either way, it was not the province of the district court

to reweigh the evidence in that regard. *See Van Steenburgh*, 171 F.3d at 1160 ("On

a motion for new trial, the district court is entitled to interpret the evidence and

judge the credibility of witnesses, but it may not usurp the role of the jury by

granting a new trial simply because it believes other inferences and conclusions

are more reasonable.").

Moreover, the government did not present this email to the jury in isolation.

Instead, it introduced a string of emails connecting the bond deal with Galanis's

apparent intent to spend the funds as he saw fit – not only on other financial

services companies but also on a condo in Manhattan's Tribeca neighborhood. For

instance, on July 11, 2014, Galanis and Archer emailed about the closing date of

22

the Wakpamni deal. In the course of this same email chain, Galanis stated they were "[s]o close" and that he was "[m]assively motivated" because his attorney, Clifford Wolff, was "running the stall for [him] on [his] nyc mansion," and he did not want to live in a "1750 square foot cage." App'x 869. Once the deal closed, Galanis did in fact purchase a new condo in Tribeca – in the name of an LLC bearing Archer's name and business address – using approximately $1 million of funds from the WAPC bank account.

While the district court discounted the email evidence linking Galanis's purchase of a Tribeca condo with the closing of the bond deal because it was "not convinced" that this showed Archer's knowledge, *Galanis*, 366 F. Supp. at 499, it was not for the district court to second guess the jury's clear choice of a different inference – namely, that Archer knew Galanis diverted the money meant for the purported annuity for his own personal use.

These emails can reasonably be read to demonstrate both that Archer knew the proceeds were supposed to be invested into an annuity and that Galanis demonstrated no restraint in spending the funds for personal gain. Thus, when taken as a whole, they provided strong support for the jury to find that Archer knew that the bond proceeds were being misappropriated. We are therefore

23

confident that the trial evidence, while circumstantial, did not "preponderate[]" sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Alston*, 974 F.2d at 1211 (internal quotation marks omitted).

## 2. Hughes and Atlantic

The evidence also strongly supported an inference that Archer intended to help the conspirators defraud Hughes's and Atlantic's clients by purchasing the bonds without informing them of the conflicts of interest that riddled the transactions – in violation of the terms of the clients' investment agreements.

As even the district court acknowledged, there was ample evidence showing that Galanis, Archer, and Cooney acquired control of Hughes and Atlantic specifically to place the Wakpamni bonds with their clients so that they could generate funds to acquire various roll-up companies. *See Galanis*, 366 F. Supp. 3d at 498. For instance, Jason Galanis emailed Archer and Cooney in May 2014, alerting them to the possibility of acquiring Hughes, which he said would be "possibly useful," App'x 854, and he kept Archer updated about the deal to acquire Hughes as it progressed, repeatedly alluding to the Wakpamni bonds in doing so. Galanis told Archer that he "believe[d] Hughes would take $28 million" of the Wakpamni bonds. App'x 871–72. And that is precisely what transpired:

The Hughes acquisition closed on or about August 11, 2014, and on August 22, 2014, Hughes purchased the entire first Wakpamni bond offering, worth $28 million, on behalf of its clients.

The email evidence told a similar story with respect to the Atlantic acquisition. Before the deal had closed, Morton sent Galanis an email – which Galanis forwarded to Archer – stating that she was reviewing Atlantic's portfolio to determine where the Wakpamni bonds could be placed. Atlantic then bought $16 million in Wakpamni bonds on behalf of one of its clients, OSERS.

The district court stressed that there was "nothing inherently illegal or illegitimate about these transactions;" rather, the fraud was that "bonds were purchased for their clients without disclosure of all of the potential conflicts of interest and [that] the bonds fell outside certain clients' investment parameters." *Galanis*, 366 F. Supp. 3d at 498. And it found that Archer had "no indication . . . that the individuals in control of the investment advisers . . . would fail to disclose the conflicts of interest or violate the terms of the clients' investor agreements." *Id.* at 498–99.

But direct evidence was not required, as "[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and

criminal intent may be established through circumstantial evidence." *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007). The jury was entitled to credit the circumstantial evidence that Archer knew that his co-defendants – with whom he had worked to acquire these companies specifically to offload the Wakpamni bonds – would then place the bonds into their investors' accounts without disclosing the conflicts of interest. The very nature of the transactions was surely suspect, particularly in light of Galanis's questionable reputation and regulatory troubles, of which Archer was well aware. Indeed, while Galanis had not yet been charged criminally at the time of the scheme, he had previously been barred from serving as a director of a public company "due to accounting irregularities" with another organization with which Galanis was involved. Tr. 905. There was testimony at trial that this fact was readily available on the internet, and Archer specifically acknowledged how "challenging" it was to "defend[]" Galanis in light of his questionable reputation. App'x 905–08. And the record clearly demonstrates that the companies were acquired specifically to offload the bonds. For instance, the trial evidence included the email – which Galanis forward to Archer – in which Morton sought to place the bonds in the investor accounts before the bond deals had even closed. Additionally, just days before the OSERS

26

purchase, Galanis noted the need to "finesse" an Atlantic managing director who would have to be "marginalized," prompting Archer to inquire how they could "get ahead of" the director. App'x 900.

At a minimum, the email exchange reflected Archer's awareness that Galanis and Morton were investing in ways that would be objectionable to the directors – which can reasonably support a finding of his nefarious intent. When considered together and as a whole, there was ample circumstantial evidence from which the jury could conclude that Archer knew that Galanis and the other conspirators were dumping Wakpamni bonds on unsuspecting investors who were oblivious to the serious conflicts of interest that infected the transactions. More to the point, the evidence certainly did not preponderate heavily against such a finding.

### 3. The Source of Funds for the Second Bond Purchase

The jury was also entitled to find that Archer, in Ponzi-like fashion, intended to promote the scheme by knowingly purchasing the bonds from the second issuance with proceeds from the first. Soon after the initial offering, John Galanis advised the Wakpamni to issue a second set of bonds worth $20 million, falsely assuring them that additional investors wanted to invest "right away." Tr. 1853–

27

54; *see also* Tr. 221. After again saying that the proceeds would be used to purchase an annuity, John Galanis represented that a "Burnham client who was excited about what had occurred with the first bond issue" wanted to purchase the additional bonds. Tr. 221. In reality, there was no "Burnham client" interested in purchasing the bonds; instead, Archer, through his real estate company RSB, purchased $15 million in Wakpamni bonds with funds that originated in the WAPC account – the proceeds from the first bond offering, which were supposed to be invested in an annuity.

To accomplish this, Archer represented to the Wakpamni in a letter that he was a sophisticated investor purchasing the bonds "for [his] own account and for investment only," App'x 618–19; Cooney signed a similar letter. And while the parties vigorously disputed whether this was a material misstatement in its own right, the jury was certainly entitled to endorse the government's view "that these statements were themselves deceptive, given that, in making them, Archer portrayed himself (through RSB) as a legitimate investor . . . using its own funds to invest." (16-cr-371, Doc. No. 623 at 54 n.16.) The jury's conclusion was amply supported by the fact that the funds used to purchase the bonds were not Archer's at all; instead, the $15 million came from Jason Galanis, who transferred the bulk

of the proceeds from the first bond offering out of the WAPC account, through numerous intermediaries, to an account controlled by Archer's company, RSB. Significantly, the last link in the chain of intermediaries was Galanis's attorney, Clifford Wolff, whom Archer knew to be the lawyer involved in Galanis's Tribeca condo purchase.

Focusing on the circuitous route by which the funds reached RSB's account, the district court drew the opposite inference to conclude that Archer was a victim of Galanis's deception, unaware that the funds were derived from the misappropriated bond proceeds. *Galanis*, 366 F. Supp. 3d at 493–94. But while the complex transaction and use of intermediaries strongly suggested that Galanis intended to conceal the source of the funds, the jury was not required to conclude that he intended to conceal the source of the funds from *Archer*. At the very least, Archer knew that the money he was using to purchase Wakpamni bonds "for [his] own account and for investment only" came from Galanis; he also had some insight into the complex route the money would take, and knew that Galanis would be transferring funds into one of his own accounts and sending them through Wolff so that Wolff could transfer them to Archer's RSB account. From

29

this constellation of facts, the jury was certainly free to draw the inference that Archer knew that the transactions were part of a fraudulent scheme.

The district court also emphasized that Dunkerley, despite being more involved in the fraud than Archer, did not realize that the funds used for the RSB purchases were from the misappropriated proceeds of the first bond offering. *Id*. But Dunkerley's knowledge had no bearing on Archer's, particularly since Galanis shared with Archer – and not Dunkerley – concerns about his lack of capital prior to transferring the $15 million to Archer. The sudden appearance of $15 million – just weeks after Galanis had repeatedly told Archer that he needed "discretionary liquidity," App'x 866, and money to buy his "nyc mansion," App'x 869 – supported a finding that the $15 million came from the first bond offering. There would, of course, typically be a distinction between one's personal liquidity and the liquidity of the company that person manages. But here the jury could justifiably conclude that there was no such distinction for Galanis, and that, instead of investing the proceeds, he was diverting the funds for his own personal use, including the purchase of a luxury New York condominium in the name of "Archer Diversified TRG, LLC." S. App'x 914; *see also* App'x 869 (discussing the closing of the deal and the condo purchase in the same chain). The jury could also,

30

then, conclude that the $15 million that appeared in Archer's account just one month later, from the same attorney who was handling Galanis's condo purchase, was from the same source – the proceeds from the first bond offering that had been diverted to the WAPC account.

The jury was certainly entitled to rely on this evidence to conclude that Archer knew the source of the $15 million he received from Galanis to purchase the second set of Wakpamni bonds. Absent exceptional circumstances, a district court confronted with a Rule 33 motion may not act as the factfinder, discounting substantial circumstantial evidence or making contrary factual findings based on inferences that the jury clearly rejected. *See McCourty*, 562 F.3d at 475–76 ("Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" (quoting *Sanchez*, 969 F.2d at 1414)); *see also Robertson*, 110 F.3d at 1118. No such exceptional circumstances were present here.

4. Archer's Lies During the Conspiracy

Perhaps the strongest evidence of Archer's guilty knowledge were his lies to two banks and the board of directors of the Burnham Investors Trust (the "BIT

31

Board") concerning the source of the funds for the second bond purchase and his relationship with Galanis. *See United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[A]cts that exhibit a consciousness of guilt, such as false exculpatory statements, may . . . tend to prove knowledge and intent of a conspiracy's purpose . . . ." (internal quotation marks omitted)). In late September and early October 2014, Archer made several false representations regarding the source of the funds used to purchase the bonds from the second bond offering. Specifically, he told Deutsche Bank that his company had "come to own these bonds" through a "Real Estate Sale." App'x 781. Similarly, he told Morgan Stanley, where he ultimately deposited the bonds, that the $15 million used to purchase the bonds was "generated through [the] sale of real estate." App'x 658–59. At trial, the government introduced a "Client Representation Letter" completed by a Morgan Stanley employee who communicated with Archer in connection with the bonds; the business record summarized Archer's statement that the "funds used to purchase the bonds were from real estate sales through [his] business, Rosemont Seneca Bohai, LLC." App'x 663. That same employee testified at trial that she "would not have written something [in that document] that a client did not say." Tr. 867. And Archer told that employee in an email that he came to know of the

purchase because he was a "shareholder" of Burnham Financial, which "packaged the issuance." App'x 658–59. Later, after depositing his bonds at a different bank "without a hitch," Cooney told Archer that Archer "[n]eed[ed] to get . . . out of Morgan Stanley," App'x 787, which could reasonably be read to suggest that Archer should move the bonds to a bank that would less closely scrutinize his transactions.

The district court stated that it "remain[ed] unconvinced" that these lies reflected Archer's knowledge that Galanis was stealing the bond proceeds, *Galanis*, 366 F. Supp. 3d at 493, speculating that Archer "may well have repeated a lie told to him by Galanis," *id.* at 501, or that perhaps the Morgan Stanley employee who completed the form indicating the source of the funds simply assumed they came from Archer's real estate transactions. But the first explanation is not supported by the record, as there was no evidence that Galanis ever told Archer that the bonds were from real estate transactions. And the second explanation is at odds with the employee's testimony that she would not have written such information down unless it came from the client. The district court also speculated that Archer may have been trying to hide that Galanis sent him the bonds because of Galanis's "well-documented checkered past," which made him a "highly controversial

33

figure." *Id.* But the jury was the factfinder, and the district court was not permitted to create a different narrative by crediting inferences that the jury clearly rejected.

And Archer not only lied to the banks. Around this same time, he also misled the BIT Board about Galanis's involvement with the Burnham companies. Again, Archer and the others sought to acquire control of various Burnham companies in order to leverage the prominent Burnham name in building their own conglomerate. When Archer requested the BIT Board's approval to acquire another Burnham subsidiary, the BIT Board sought certain assurances. Then, during a BIT Board meeting on October 1, 2014, Archer warranted that Galanis "w[ould] not be involved with any of the Burnham entities[,] their 'affiliated persons[,]'" or "their successors or assigns." App'x 748. He further pledged that Galanis "w[ould] have no interest of any kind, direct or indirect, in any of the Burnham entities," and that "the Burnham entities will not invest with or in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association, affiliation, or investment, pecuniary or otherwise, directly or indirectly." App'x 748.

While Archer did not make this warranty in the context of the Wakpamni scheme directly, his response, at a minimum, was misleading. Galanis, of course,

34

spearheaded the Wakpamni scheme, and Burnham entities, including the placement agent, Burnham Securities Inc., were intimately involved in that scheme. Galanis also supplied money for Archer to buy the bonds from the second offering, which Archer would use to support the net capital of companies he controlled, including a Burnham entity.

The district court nevertheless "remaine[d] unconvinced" that Archer made these statements "because he knew that Jason Galanis was stealing the bond proceeds." *Galanis*, 366 F. Supp. 3d at 501. But a trial court "must defer to the jury's resolution of the weight of the evidence," *Sanchez*, 969 F.2d at 1414 (internal quotation marks omitted), and may not weigh the competing inferences and choose the one it finds "[m]ore likely," *Galanis*, 366 F. Supp. 3d at 501. And the mere fact that competing inferences existed does not compel a finding that the evidence preponderated heavily against the verdict.

### 5. The Cover-up

Finally, there was persuasive evidence that Archer knowingly performed two key actions in furtherance of a cover-up designed to delay discovery of the scheme. First, on September 1, 2015, he transferred $250,000 to WAPC – the purported annuity provider – when the first set of interest payments were due.

These funds were then used to help pay the interest on the bonds, thereby delaying disclosure of the fraud. Jason Galanis later repaid Archer in part, which he did using money from entities that had received proceeds from the third offering.

The district court found the "inference urged by Archer" – that he was simply providing needed short-term liquidity – "equally if not more compelling" than the government's contention that Archer intended to prop up the scheme to forestall the revelation that would come with defaulting on the payments. *Id.* at 503. But even Archer does not dispute that he had no legitimate affiliation with WAPC, which, despite the similar name, was not connected to Wealth Assurance Holding, with which Archer *was* affiliated and which had been falsely represented to the Wakpamni as the annuity provider. Thus, while it may have been true, as the district court observed, that Archer often infused cash into his companies for legitimate purposes, WAPC was *not* one of Archer's companies. Whether or not Dunkerly or Galanis ever discussed the true nature of WAPC with Archer, the jury was certainly entitled to infer that Archer's transfer of $250,000 to a company with which he was not affiliated, completed shortly before the interest on the first bonds was due, reflected his knowledge of the scheme and was designed to prevent it from unraveling in the event of a default.

Second, Archer made false statements concerning Calvert, the fraudulent entity created to cover the conspiracy's tracks and delay discovery of the scheme. While the government acknowledges that it did not present any direct evidence showing that Archer created any fake Calvert documents or gave any to regulators, as Cooney had done, it did present clear evidence that Archer explicitly used Calvert's name in furtherance of the scheme. Specifically, on November 25, 2015, Archer sent an email to an employee at a roll-up company that had taken possession of some of the bonds from the second offering, stating that the bonds needed "to be replaced/returned to Calvert" as "the lender and beneficial owner" of the bonds. App'x 912. Obviously, Calvert was not the "lender and beneficial owner" of the bonds, as Archer claimed, since it had not even existed when Archer purchased the bonds and never lent Archer money for the bond purchases or anything else.

The district court downplayed this email, reasoning that "a single reference to Calvert in an email does not establish" Archer's knowledge. *Galanis*, 366 F. Supp. 3d at 504. It further concluded that "the weight of the evidence undercuts the notion that Archer was aware of the Calvert cover-up" since "Jason Galanis and Hugh Dunkerley came up with the idea for the entity," "Dunkerley testified

37

that neither he nor anyone else discussed Calvert with Archer," and Archer was not involved in backdating the Calvert forms. *Id*. But Archer clearly knew that Calvert was not the beneficial owner of the bonds, as he was involved in the bond issuance. Perhaps "a single reference" to Calvert would be insufficient if the record were otherwise devoid of evidence, but it was not, and the jury was entitled to draw inferences as to Archer's knowledge and intent from his explicit lie to a third party made during the course of and in furtherance of the cover-up.

\*\*\*

The review of the evidence above illuminates two broader concerns we have with the district court's ruling. First, the preponderates heavily standard specifically requires that the district court make a comprehensive assessment of the evidence. While the district court acknowledged that the "case must be assessed as a whole, rather than taking each piece of evidence in isolation," *id.* at 507, its analysis veered into a piecemeal assessment of the evidence that understated the weight of the proof in its totality. Indeed, in rejecting Archer's Rule 29 motion, the district court recognized that there was "a substantial amount of circumstantial evidence" showing Archer's intent, which was subject to competing inferences. *Id.* at 492. This evidence, when viewed as a whole, strongly

38

supported that Archer knew at least the general nature and extent of the scheme and intended to bring about its success. At a minimum, that evidence did not preponderate heavily against the verdict in this regard.

Second, the preponderates heavily standard does not permit a district court to elevate its own theory of the evidence above the jury's clear choice of a reasonable competing theory. Specifically, the district court here adopted the defense's theory that Archer was duped by Galanis, and in doing so improperly discredited the competing arguments regarding Archer's reasons for participating in the fraud. The district court noted that "Jason Galanis operated to keep people in the dark, even those who were undoubtedly willful participants in his various crimes." *Id.* at 505. It noted that "his efforts as to Archer were even more concerted," citing Galanis's attempts to keep Archer away from Dunkerely and how "the members of the conspiracy spoke of Archer when he was not present, burnishing his credentials to others and describing him, among other things, as 'the biggest show pony of all time' whose involvement would 'add layers of legitimacy' to the various deals." *Id.* It noted that, "[a]t the same time Archer was spoken of in this manner, Galanis was simultaneously operating to ingratiate himself with Archer," which "further suggests that Archer was not a party to this

conspiracy but was instead being manipulated by a skillful con artist." *Id.* While this theory was by no means outlandish and does find some support in the record, the fact remains that defense counsel promoted it at length during trial, and the jury rejected it. Moreover, while there assuredly was evidence that Galanis paraded Archer's credentials to facilitate the fraud, there was also evidence that Archer both knew this and willingly allowed Galanis to do so.

The government, by contrast, presented a competing theory regarding Archer's motive to engage in the fraud that the jury found "compelling" even if the district court did not. *Id.* at 492. In its opening statement, the government argued that the Defendants "needed money . . . to fund their business empire," Tr. 54, and that they "planned to use [the $60 million bond purchase] for themselves and for their own businesses," Tr. 56. Although the prosecution contrasted John Galanis's goals with those of Archer and Cooney – that is, while John Galanis spent money on "jewelry and luxury cars, . . . Archer and Cooney planned to make that money work for them quietly," Tr. 58 – the distinction was hardly exculpatory. The government's theory that Archer and Cooney intended "to use the bonds for themselves to further their schemes," Tr. 59, which included building "a big

financial services company under the Burnham name," Tr. 59–60, was fully consistent with the evidence in the case.

During summation, the government again emphasized that "[t]he Wakpamni bonds were a massive fraud, a scam, a scheme . . . to fund the luxurious lifestyles of the few, [and] to fund personal business ventures" of others. Tr. 3595. It repeated, yet again, that Archer and Cooney benefited from using the $20 million worth of bonds "for their own business purposes" and to support their "financial empire." Tr. 3650. Although Archer may not have received an envelope of cash or a condo from the scheme, the district court's finding that there was no "compelling" motive presented to the jury was simply incorrect. While the district court placed considerable emphasis on the extent to which Archer knew of Galanis's personal gain from the fraud, it is clear that the fraud had multiple motivations, and it was not necessary that Archer be fully versed in all of them. The jury had before it considerable evidence from which it could conclude that a second motive, more personal to Archer, existed and was furthered by the scheme.[4]

---

[4] Although the district court further concluded that the summary chart reflecting the chain of payments in the scheme was so misleading that it supported overturning the jury's verdict and granting a new trial, we are unpersuaded. The summary chart showed a payment that was accidentally made to Archer's company, RSB, and reversed twelve days later. Even if arguably somewhat confusing, the chart was accurate, as it

In sum, the preponderates heavily standard requires that the district court determine whether all the evidence at trial, taken as a whole, preponderated heavily against the verdict. It does not, however, permit the district court to elect its own theory of the case and view the evidence through that lens. Having now clarified the standard to be applied by a district court in assessing a Rule 33 motion, we find that the evidence here did not preponderate heavily against the verdict. Because we conclude that there is only one result available upon proper application of the preponderates heavily standard – reinstatement of the jury verdict – there is no need to remand for further consideration of this issue by the district court.

## CONCLUSION

For the reasons stated above, we reverse the district court's grant of the Rule 33 motion, reinstate the conviction, and remand the case to the district court for sentencing.

---

explicitly listed that this payment was reversed. *See United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986) (recognizing that a chart must "fairly represent and summarize the evidence upon which [it was] based" to avoid misleading the jury). And as the district court recognized, the threat of prejudice was mitigated by the cross-examination, which highlighted the payment reversal. Consequently, the error, if there was one, was harmless, and not a basis to take the "exceptional" step of granting a new trial.