20-258(L)
*United States v. Mickens, et al.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of July, two thousand twenty-one.

PRESENT:
> SUSAN L. CARNEY,
> JOSEPH F. BIANCO,
> > *Circuit Judges*,
> NICHOLAS G. GARAUFIS,
> > *District Judge.*[*]

———————————————————————————

UNITED STATES OF AMERICA,

> *Appellee*,

> v.                                                     Nos. 20-258 (L),
>                                                             20-462, 20-630

GERUND MICKENS, AKA BREEZE, TERRELL HUNTER,
AKA RELL, AKA KILLER, HAROLD COOK, AKA OINK,

> *Defendants-Appellants*,

———————

[*] Judge Nicholas G. Garaufis, of the United States District Court for the Eastern District of New York, sitting by designation.

JESUS ASHANTI, AKA BLACK, DOUGLAS LEE, AKA FLY,

    *Defendants.*†

_____

| | |
|---|---|
| FOR DEFENDANTS-APPELLANTS: | ERICA A. BARBER, Frost Bussert, LLC, New Haven, CT (for Harold Cook). |
| | JEREMIAH DONOVAN, Law Offices of Jeremiah Donovan, Old Saybrook, CT (Justin T. Smith, Duffy Law, LLC, New Haven, CT, *on the brief*) (for Terrell Hunter). |
| | JAMES P. MAGUIRE, Assistant Federal Public Defender, *for* Terence S. Ward, Federal Public Defender for the District of Connecticut, Hartford, CT (for Gerund Mickens). |
| FOR APPELLEE: | JOCELYN JOAN COURTNEY KAOUTZANIS, Assistant United States Attorney (Marc H. Silverman, Assistant United States Attorney, *on the brief*), *for* Leonard C. Boyle, Acting United States Attorney for the District of Connecticut, New Haven, CT. |

Appeal from judgments of the United States District Court for the District of Connecticut (Underhill, *C.J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of conviction entered on January 15, 2020, against Gerund Mickens, and on January 31, 2020, against Terrell Hunter and Harold Cook, are **AFFIRMED**.

Gerund Mickens, Terrell Hunter, and Harold Cook (collectively, "Defendants") appeal from their respective judgments of conviction, entered after a jury trial conducted in

_____

† The Clerk of Court is directed to amend the caption to conform to the above.

2018, arising out of the robbery, kidnapping, and murder of Charles Teasley in Hartford, Connecticut, in January 2009. As relevant here, the jury found Mickens, Hunter, and Cook each guilty of kidnapping resulting in the death of a person, *see* 18 U.S.C. §§ 1201(a)(1) and 2 ("Count One"), and the use of a firearm to commit murder in the course of a Hobbs Act robbery, *see* 18 U.S.C. §§ 924(j)(1) and 2 ("Count Three").[1] The District Court sentenced each defendant to life imprisonment. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, which are set out at length in the District Court's decision denying Defendants' Federal Rules of Criminal Procedure 29 and 33 motions, *United States v. Cook, et al.*, 2019 WL 4247938 (D. Conn. Sept. 6, 2019), and refer to this background only as needed to explain our decision to affirm.

## I.    Motion to Dismiss for Pretrial Delay

On appeal, all Defendants seek reversal based on pre-indictment delay.[2] They argue that the lengthy interval between Teasley's kidnapping, robbery, and murder in January 2009 and the return of the indictment in March 2017 violated their Due Process rights and requires dismissal of all charges. They claim resulting prejudice primarily based on the death in 2015 of key witness Desmond Wright and the Government's loss of notes taken during an April 2011 interview with cooperator Jesus Ashanti. The District Court rejected this challenge, first made by Mickens before trial. We do as well.

This Court "review[s] a district court's decision denying a motion to dismiss an indictment *de novo*" and the "district court's factual findings for clear error." *United States v. Yousef*, 327 F.3d 56, 137 (2d Cir. 2003).[3] The defendant "carr[ies] a heavy burden to sustain a claim of violation of due process" because of pre-indictment delay. *United States v. Elsbery*,

---

[1] The jury also found Defendants guilty of Count Two, which charged the use of a firearm to commit murder during a crime of violence (specifically, a kidnapping), *see* 18 U.S.C. §§ 922(j)(1) and 2. After the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), however, the District Court granted the Government's post-trial motion to dismiss Count Two as to Defendants, concluding that *Davis* eliminated kidnapping as a predicate "crime of violence" under 18 U.S.C. § 924(c)(3) and thus voided the Count Two convictions.

[2] They do not claim a Speedy Trial Act violation.

[3] Unless otherwise noted, in quoting caselaw, this Order omits all alterations, citations, footnotes, and internal quotation marks.

602 F.2d 1054, 1059 (2d Cir. 1979). He "must prove that the delay resulted in actual prejudice and that the prosecution's reasons for the delay were improper." *Bierenbaum v. Graham*, 607 F.3d 36, 51 (2d Cir. 2010).

Although the pre-indictment period of investigation was indisputably long, Defendants fail to demonstrate that it was improperly motivated or that they were materially prejudiced by it. For these reasons, their challenge fails.

### A. Actual Prejudice

### 1. Desmond Wright's Absence from Trial

Defendants contend that Wright's absence prejudiced the defense. They assert that Wright himself had an incentive to rob Teasley and imply that he may have committed the crime. They also suggest that Wright may have had information about earlier robberies that Teasley and Wright committed together against individuals who may have sought retribution against Teasley and who therefore might instead have been Teasley's murderers.

Like the District Court, we consider this argument "highly speculative" and therefore inadequate to warrant the indictment's dismissal. Gov't App'x at 74. It is true that prejudice may be demonstrated by the "unavailability of a key witness." *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999). But Defendants here fail to assert "with any specificity or assurance what [Wright] would have said on the stand or how his testimony would have aided their case." *United States v. King*, 560 F.2d 122, 130 (2d Cir. 1977). To the extent the defense sought to shift blame for Teasley's murder onto Wright, the defense was able to use Wright's absence to its advantage: in closing, Mickens's counsel highlighted that Wright had been present at the crime scene and insinuated that Wright could have been responsible for Teasley's murder. In sum, Defendants do not carry their heavy burden of showing that Wright's absence resulted in actual prejudice to their defense.

### 2. April 2011 Interview Notes

Defendants' claims of prejudice resulting from the loss of FBI Special Agent William Aldenberg's April 2011 notes of his interview with Jesus Ashanti are similarly unpersuasive. During that undoubtedly important meeting, Ashanti recanted his previous statements incriminating Cinque Sutherland in the Teasley murder. Defendants argue that the loss of

the agent's notes prejudiced them by hampering their cross-examination of Ashanti during trial.

The Government promptly disclosed Ashanti's recantation to the court in an affidavit. That affidavit was provided to the defense during pretrial discovery. The Government also subsequently provided a report regarding the recantation and the loss of the notes. Defendants were able to use Ashanti's changing account of events against him at trial. The defense also had ample opportunity to cross-examine Agent Aldenberg about the April 2011 meeting, and they did so. The defense further attacked Ashanti's credibility in closing arguments based on his contradictory testimony about Sutherland. Defendants offer no basis for believing that information of value to them appeared in the misplaced notes; rather, they do no more than speculate about information that might have been discovered in the notes. On review, we see no basis for disturbing the District Court's determination that the loss of the notes was inadequately prejudicial to warrant dismissal for delay.

## B. Improper Purpose

A defendant also bears a "heavy burden" when aiming to establish that the pre-indictment delay was "a course intentionally pursued by the government for an improper purpose," a requirement for dismissal. *Cornielle*, 171 F.3d at 752. Here, Defendants point to no evidence suggesting that the reason for the Government's delay was improper. The delay after Ashanti's initial inculpation of Defendants in January 2011 and the indictment in 2017 appears reasonably to have stemmed from the Government's efforts in re-examining the original 2009 investigation and in obtaining relevant DNA analysis and call-detail records. Accordingly, the evidence amply supports the District Court's conclusion that the delay was an "investigative delay," and not an intentional protraction of proceedings "solely to gain tactical advantage over the accused." *See United States v. Lovasco*, 431 U.S. 783, 795 (1977). For this reason, too, the District Court did not err in denying the motion for dismissal based on delay.

## II.   Jesus Ashanti's Testimony

After their conviction at trial, Defendants moved under Rule 29 of the Federal Rules of Criminal Procedure for judgments of acquittal or, in the alternative, under Rule 33 for a

new trial. The District Court rejected the motions, giving them careful consideration in a comprehensive and methodical written opinion. *Cook*, 2019 WL 4247938, at \*3-19. Defendants now renew these challenges to the jury's verdict, urging that the testimony of Jesus Ashanti—without a doubt the cornerstone of the prosecution's case—was "incredible on its face" and "def[ied] physical realities," warranting either reversal or a new trial. *See United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012). For the reasons set forth below, we are not persuaded.

### A. Motion for Judgment of Acquittal

Rule 29 permits a trial court to set aside a jury's guilty verdict if it determines the evidence was insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). The court may do so, however, "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). It is well-established that "[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory[,] and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). Of particular note in this case, "even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face [and] does not defy physical realit[y]." *Truman*, 688 F.3d at 139. We review *de novo* the denial of a Rule 29 motion. *See United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015).

The Government readily acknowledges that Ashanti's testimony in the pretrial proceedings and at trial displayed inconsistencies and reflected fabrication. The essential elements of Ashanti's testimony regarding the criminal conduct of these Defendants, however, remained unchanged throughout his interaction with the Government and at trial. Ashanti consistently testified as to the following core facts.

In Hartford, Connecticut, on the night of January 9, 2009, Cook, Mickens, Hunter, and Ashanti made a plan to rob an individual they called "Sickle Cell Troy." Gov't App'x at 878-86. Later that evening, they decided instead to rob Charles Teasley, targeting Teasley for his earnings from illegal drug sales. The group staged a meeting between Teasley and

eventual co-defendant Douglas Lee,[4] during which the group overpowered Teasley and zip-tied his hands.[5] They then forced Teasley into the back seat of his car, an Acura. Defendants and Ashanti ascertained that Teasley had money at home in a safe, which they then retrieved there from Teasley's girlfriend, Kimberly Brookens. After leaving Teasley's house, Cook, Mickens, and Hunter drove away with Teasley in Teasley's car. At some point not much later, Ashanti, who was following the Acura in his own car, saw two flashes in the cabin of the Acura and inferred that the others had shot Teasley. The group then abandoned Teasley's car, leaving his body behind in it, and all drove away in Ashanti's vehicle.

Ashanti's testimony about this course of events was corroborated by further testimonial as well as physical and cellphone evidence. DNA evidence connected Mickens, Hunter, and Ashanti to Teasley's car or clothing. Brookens testified that a stranger with a Jamaican accent came to Teasley's home, picked up Teasley's safe, and then left in Teasley's car on the night of the murder. Ballistics evidence confirmed Ashanti's account that the gunshots that killed Teasley were fired by a .380 caliber firearm. Cell phone call-detail records established calls between Lee and Teasley, and Lee and Cook, on the night of the murder in the general period when Brookens estimated that Teasley left their home for the drug transaction. Cell site location data showed the route that Teasley's phone traveled in the timeframe of the murder; that data tracked the account that Ashanti gave. The cell site location data ends with Teasley's phone pinging a final time at 10:34 p.m., near the location where his body was discovered.

Breaking down the evidence with regard to each of Mickens, Hunter, and Cook, the jury was presented with primarily the following incriminating evidence:

*Gerund Mickens:* Ashanti testified that Mickens participated in kidnapping, robbing, and murdering Teasley on January 9. Ashanti recounted that Mickens retrieved Teasley's safe

---

[4] Lee was tried separately from Defendants and was ultimately acquitted on a Rule 29 motion after a guilty verdict. He is not a party in this appeal, and he did not testify at the trial of Mickens, Cook, and Hunter.

[5] Ashanti testified that Ashanti, Mickens, Cook, and Hunter went to Lee's house, and that Lee was present at the house before Teasley arrived for the planned drug transaction. Ashanti did not know where Lee went after Teasley arrived.

from Kimberly Brookens. Brookens testified that she gave the safe to a person unknown to her but who had a Jamaican accent and who then left in Teasley's car.[6] Ashanti similarly testified that Mickens had intentionally used a Jamaican accent to disguise his voice in other circumstances in the past. Leila Timm, an analyst with the Connecticut forensic science laboratory, testified that Mickens's DNA was consistent with DNA taken from the front surface of the coat that Teasley was wearing on the night of the murder. In particular, Timm testified that the expected frequency of individuals who could not be eliminated as a contributor to that DNA profile was approximately one in 2,900 in the relevant population.[7]

*Terrell Hunter:* Ashanti testified that Hunter also participated in kidnapping, robbing, and murdering Teasley on January 9. When reviewing a photo line-up shortly after Teasley's body was discovered and again at trial, Kimberly Brookens identified Hunter as the person to whom she gave the safe on the night of the murder. (Brookens also testified, however, that she was "not sure" of her identification of Hunter. Gov't App'x at 775-77.)

Ashanti further testified that when he, Hunter, Mickens, Cook, and Teasley were in Teasley's car, Hunter sat in the back seat behind the passenger (Mickens), Ashanti sat in the back seat behind the driver (Cook), and Teasley sat between Hunter and Ashanti in the back seat. Hunter's DNA was consistent with DNA taken from the interior handle of the driver's side rear door of Teasley's Acura. The DNA evidence was described as showing that Hunter "could not be eliminated" as a contributor at an expected frequency of "approximately one

---

[6] As noted, Ashanti testified that Mickens sat in the front passenger seat when all five men were in Teasley's car. Mickens assails this account as physically impossible, pointing out that when investigators examined Teasley's car, they found the front passenger seat was pushed far forward—too far forward, he argues, for a man of Mickens's size (about 6'4") to have occupied that passenger seat. But the seat's positioning when the car was found does not make Ashanti's testimony "physically impossible," contrary to Defendant's argument. Ashanti did not testify regarding how Defendants were positioned in the car at the time of the shooting; he testified that he was not present in Teasley's car when the shooting occurred. Instead, he was following Defendants in his own car. In addition, the government points out that time passed between the shooting and the investigators' discovery of the car, during which the position of the seats could have been adjusted, for example, to gain access to the body. The jury was entitled to weigh all this evidence and could have reasonably believed Ashanti and concluded that Mickens was involved in the criminal activity regardless of the ultimate position of the front passenger seat.

[7] Based on Timm's testimony, we understand these statistics to mean that the expected frequency of individuals who *could* be a contributor to that DNA profile is approximately one in 2,900 in the relevant population—suggesting that the DNA analysis was generally probative of Mickens's presence.

8

in 9.1 million" in the relevant population.[8] Gov't App'x at 602-03. (Hunter's defense claims that Hunter's DNA could have been left in Teasley's car after a past drug sale.)

At trial, Ashanti testified that Hunter had the .380 firearm that was later identified as the murder weapon. While tailing the Acura, Ashanti further recounted, he saw two flashes in the Acura, which he believed were gunshots. Ashanti also testified that, after the shooting, he overheard a conversation between Cook and Hunter in which Hunter intimated that Hunter and Cook *both* had shot Teasley. Ballistics evidence established that the gunshots that killed Teasley were fired from a .380 caliber firearm, which aligns with Ashanti's testimony that a .380 was one of the guns carried by Defendants that evening.

*Harold Cook:* Ashanti testified that Cook was a lead participant in the kidnapping, robbery, and murder of Teasley. According to testimony from Ashanti and Brookens, Douglas Lee called Teasley's cell phone that evening and spoke with Teasley about a cocaine transaction. Cook then received a phone call from Lee alerting him to the upcoming transaction. Based on this information, Defendants staged a meeting between Lee and Teasley at Lee's house, setting the events of the evening in motion. Consistent with this testimony, call-detail records established calls between cell phones belonging to Lee and Teasley and separately between Lee and Cook on the night of the murder. Additionally, as described above, Ashanti testified that, after the shooting, he overheard a conversation between Cook and Hunter in which Hunter intimated that Hunter and Cook both shot Teasley.

On appeal, as in the District Court, Defendants point to certain pieces of evidence— inconsistencies in Ashanti's testimony regarding Defendants' alleged torture of Teasley; the unknown DNA contributor on the zip ties used to bind Teasley's hands; the manner of the shooting as reflected by the position of the fatal wounds; and the placement of the front passenger seat—that fit ill with Ashanti's narrative. They highlight these as part of their challenge to the sufficiency of the evidence. None of this evidence contradicts Ashanti's testimony sufficiently, however, to render his overall narrative "patently incredible" or to

---

[8] We understand this to mean that that the expected frequency in the relevant population of individuals who could be a contributor of that DNA profile is approximately one in 9.1 million.

9

warrant characterizing it as "def[ying] physical realit[y]." *Truman*, 688 F.3d at 138-39. The jury heard argument about these points of alleged inconsistency. Although to some these points might undermine confidence in certain aspects of Ashanti's credibility or his narrative of the criminal events, they are not so compelling that they entitle us "to substitute [our] own determination of the weight of the evidence . . . for that of the jury." *Guadagna*, 183 F.3d at 129.

We therefore conclude, based on the totality of the record evidence, that a reasonable jury had a sufficient foundation to credit Ashanti's overall version of the events and determine that these three Defendants kidnapped, robbed, and murdered Teasley. Although heavily dependent on Ashanti's version of the events, that narrative was generally corroborated by cell phone, ballistics, and DNA evidence. This is not a case in which "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* at 130. Defendants had ample opportunity to cross-examine Ashanti and highlight for the jury the inconsistencies in his testimony. They were able to challenge his credibility, test the adequacy of the police investigation, and suggest alternative narratives of culpability. After thorough review, we reject Defendants' Rule 29 sufficiency challenge.

## B. Motion for New Trial

Rule 33 confers broad discretion on a trial court to order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review the denial of a Rule 33 motion for abuse of discretion, assessing the factual findings that support the district court's decision for clear error. *See United States v. Rigas*, 583 F.3d 108, 125 (2d Cir. 2009). "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).

Defendants essentially recast their Rule 29 sufficiency challenge in seeking a new trial under Rule 33. Upon review, we decide that the District Court here acted well within its discretion in concluding that the questionable aspects of Ashanti's testimony and other

10

aspects of this difficult case did not entitle Defendants to a new trial under Rule 33. As discussed above, record evidence allowed a rational trier of fact to find the essential elements of the charged conduct beyond a reasonable doubt. Defendants offer no persuasive reason to conclude that the jury's verdict inflicted a "manifest injustice." *Id.* This challenge too falls short.

### III.  Interstate Nexus of Hobbs Act Robbery Convictions

Defendants next each assert entitlement to a judgment of acquittal on Count Three, arguing that the Government failed to prove the interstate nexus element of Hobbs Act robbery, a predicate to this crime of conviction.

A person commits Hobbs Act robbery when that individual:

> in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to [commit robbery].

18 U.S.C. § 1951(a). Under the statute, "robbery" is "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force[.]" *Id.* § 1951(b)(1). Robbery covered by the Hobbs Act, an "unmistakably broad" federal criminal statute, has been held to "reach[] any obstruction, delay, or other effect on commerce, even if small, and the Act's definition of commerce encompasses all . . . commerce over which the United States has jurisdiction." *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016). In *Taylor*, the Supreme Court instructed that "to satisfy the Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds," reasoning that "the market for illegal drugs is commerce over which the United States has jurisdiction." *Id.* at 2081.

Here, Defendants contend that they did not steal drug "proceeds" from Teasley and that the Government has otherwise failed to show the requisite interstate nexus. Their challenge misses the mark. The trial evidence established that Douglas Lee coordinated a drug transaction with Teasley to take place on the night of the murder. As the District Court concluded, Defendants targeted Teasley because they believed that Teasley—a drug dealer

11

en route to purchase cocaine—would be carrying funds to pay for the drugs. *Cook*, 2019 WL 4247938, at *7. Further, when Defendants targeted Teasley, they believed that he had recently sold his car, a BMW (which Brookens testified Teasley had purchased with drug proceeds from a drug heist[9]) and that he was therefore holding a large amount of cash. When Defendants abducted Teasley, they also stole Teasley's safe, which Brookens testified Teasley used to store money, drugs, and personal documents.

As the District Court noted, although the safe did not in fact contain the vehicle sale or drug transaction funds, it was established that Defendants intended and attempted to rob Teasley of the contents of the safe. *Id.* at *7 n.5; *see also United States v. Lee*, 834 F.3d 145, 154-55 (2d Cir. 2016) (rejecting sufficiency of the evidence challenge to underlying nexus element where defendants robbed empty safe). Construing the Hobbs Act broadly, as the Supreme Court has instructed, we conclude that the record evidence suffices to show that Defendants "knowingly stole or attempted to steal drugs or drug proceeds" from Teasley when they robbed him of his safe. *Taylor*, 136 S. Ct. at 2079. Defendants' challenge to the interstate nexus element of their Hobbs Act robbery convictions thus fails.

## IV.  Alleged *Brady* Violations

In an April 2011 interview with Agent Aldenberg, as described above, Ashanti recanted his earlier testimony that Cinque Sutherland, too, was involved in the Teasley murder and related crimes. Defendants urge us to conclude that the Government violated its production obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to create and provide a written report (a "302 report") of the interview and by failing to preserve and produce notes taken by Agent Aldenberg during the interview. Relatedly, Defendants maintain that the District Court should have given an adverse inference instruction based on

---

[9] Brookens testified that Teasley purchased a car—a "[v]ery flashy" BMW—with proceeds from the earlier drug heist. Gov't App'x at 742. Brookens confirmed that she was concerned about Teasley driving the car because "he just robbed someone" and Brookens feared that "[driving the car around] would draw attention to him." *Id.* Brookens stated that, after expressing her concerns to Teasley, he agreed to sell the car. On the night of the murder, the car was at a local shop to be sold. Brookens did not know whether Teasley had already sold or received an advance payment on the car.

the notes' absence. In a separate argument, Defendants contend that the Government violated *Brady* by failing to disclose its annotations of Teasley's cell phone record.

Defendants contend that these assorted violations entitle them to a new trial. For the reasons set forth below, their challenge fails.

### A. April 2011 Interview Notes

#### 1. Alleged *Brady* Violation

Under the doctrine established in *Brady*, the Government must "disclose material evidence favorable to a criminal defendant." *United States v. Rowland*, 826 F.3d 100, 111 (2d Cir. 2016). "Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*

This Court has rejected the "contention that *Brady* or the Confrontation Clause requires the Government to take notes during witness interviews." *United States v. Rodriguez*, 496 F.3d 221, 224 (2d Cir. 2007). At the same time, we have explained that "[f]rom the fact that the Government is not required to make notes of a witness's statements, it does not follow that the Government has no obligation to inform the accused of information that materially impeaches its witness." *Id.* at 225. When no notes are taken during a witness interview, but material information favorable to a defendant emerges, *Brady* obligates the Government to provide that information "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." *Id.* at 226.

Here, as the District Court ruled, the Government was not obligated to take notes during the April 2011 interview or to memorialize the meeting by creating a 302 report. *Cook*, 2019 WL 4247938, at *15. Agent Aldenberg made a record of Ashanti's recantation in an affidavit prepared and submitted to the court shortly after the interview, and provided to the defense well before trial. The Government repeated the disclosure in representations to the District Court and in a report, and elicited trial testimony on the matter. Defense counsel had ample opportunity to examine Agent Aldenberg and Ashanti regarding the April 2011 meeting. *See id.* at *14-16. There is no evidence to suggest that the Government failed to

13

inform the defense of materially exculpatory or impeaching statements made during that interview. Accordingly, the Government effectively disclosed Ashanti's recantation, and there was no *Brady* violation.

Even if the Government's disclosure was somehow inadequate, however, Defendants have not demonstrated resulting prejudice. As the District Court reasoned, "there is nothing to suggest that if the defendants received a contemporaneous, and perhaps a more detailed, report of the April 25, 2011 meeting, that there was a reasonable probability of a not guilty verdict." *Id.* at *16. Defendants are therefore not entitled to a new trial on *Brady* grounds.

### 2. Adverse Inference Instruction

Defendants relatedly demand a new trial on the basis of the District Court's denial of their request for an adverse inference instruction based on the lost notes. To obtain such an instruction, a defendant must establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012). But as explained above, the Government was not obligated to take notes during the April 2011 meeting, *Rodriguez*, 496 F.3d at 224, and this Court has not held that the Government was required in all events to preserve any notes that were taken. *Id.* at 225 n.3 ("We need not and do not consider whether, in some cases, the preservation of exculpatory or impeaching information in a concrete form—such as by note taking—may be necessary to ensure that the information can be relayed accurately to the defense."). Nor have Defendants made even a weak showing of a "culpable state of mind" on the part of the Government. Defendants have not established the claimed entitlement to an adverse inference instruction, and thus the District Court did not err in declining to give one.

### B. Annotated Phone Records

Defendants urge a second *Brady* violation in the Government's failure to disclose to defense counsel annotated cell phone records, which FBI Special Agent Ryan James referenced during his testimony. The Government refreshed Agent James's recollection

14

using notes from his folder. Then, on Defendants' request, the Government disclosed annotated versions of Teasley's phone data "indicat[ing] . . . the names the government believes are associated with various phone numbers." Gov't App'x at 1927. According to Defendants, the annotations revealed a phone call made to Teasley from an unknown number around the time of Teasley's kidnapping. To address this concern, the District Court invited the defense to recall Agent James and inquire about the unknown telephone number. The defense declined.

Defendants claim that the information contained in the annotations, which revealed that the Government did not identify the unknown caller, is *Brady* material because it could have been used to impeach Agent James and suggest that the investigation was not thorough. Having heard this argument, the District Court concluded that no *Brady* violation occurred. It reasoned that: the Government did not know the identity of the unknown caller, and therefore could not disclose that information, and the Government immediately disclosed the annotated records upon request, remedying any failure to do so earlier; Defendants had the opportunity to cross-examine Agent James on the Government's investigation into the unknown number and elected not to do so; and Defendants themselves had a copy of Teasley's phone data, containing the record of the unknown number, demonstrating that they were already on notice of the number and could have investigated it themselves. Under these circumstances, we identify no error in the District Court's rejection of the post-trial defense theory that disclosure of the annotated records would have altered the outcome of the proceedings. Nondisclosure does not warrant retrial.

## V. Closing Argument for Gerund Mickens

Mickens contends that limitations imposed by the District Court on his closing argument improperly precluded him from articulating his theory of the case and that the asserted error requires a new trial. He focuses on restrictions on his trial counsel's attempt to challenge the thoroughness of the Government's investigation and to cast doubt on his guilt by emphasizing the Government's failure to explore leads regarding "the Jamaicans" as possible suspects in the crime. The District Court stopped Mickens's counsel from discussing "the Jamaicans" during closing argument on the ground that there was "simply no

15

support in the record" affirmatively implicating "the Jamaicans"—whoever they might be—in the kidnapping, robbery, and murder of Teasley. *Cook*, 2019 WL 4247938, at *19.

Parties "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." *United States v. Daugerdas*, 837 F.3d 212, 227 (2d Cir. 2016). Even so, a district court has "broad discretion" in controlling summation. *Herring v. New York*, 422 U.S. 853, 862 (1975).

Even if the District Court acted improperly by curtailing this aspect of the closing argument, Mickens fails to establish that the error caused him substantial prejudice. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992); *Lee*, 834 F.3d at 161 ("[A] court's decision to limit the scope of summation will not be overturned absent an abuse of discretion. There is no abuse of discretion if the defendant cannot show prejudice."). He urges that he was unable to argue "that the government's account was inescapably tainted by the fact that the investigation relied upon Ashanti's narrative to determine the scope of the investigation" and that the Government failed to "independently corroborate" Ashanti's account. But Mickens and the other Defendants did make that argument, emphatically and repeatedly, throughout their cross-examinations and closing statements. Mickens does not describe any points he wished to make through the curtailed line of attack that were not already made robustly to the jury. For that reason, any error was harmless, and Mickens is not entitled to a retrial on this basis.

## VI. Alleged Prosecutorial Misconduct

Defendants claim six instances of misconduct during the Government's presentation of its case-in-chief and its closing argument, all in their view warranting reversal. We disagree.

Defendants face "a heavy burden" when seeking a new trial on the basis of prosecutorial misconduct. *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). "[T]he misconduct alleged must be so severe and significant as to result in the denial of their right to a fair trial." *Id.* In evaluating a claim of prosecutorial misconduct, courts consider: "(1) the severity of the alleged misconduct; (2) the curative measures taken; and (3) the likelihood of conviction absent any misconduct." *Id.* at 945-46. We review the district court's decisions

16

regarding prosecutorial misconduct claims for abuse of discretion. *See United States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018).

## A. Agent Aldenberg's Testimony

Defendants argue that the Government impermissibly bolstered Ashanti's credibility by "[e]licit[ing] [m]isleading [t]estimony" from Agent Aldenberg about the April 2011 recantation interview. Hunter Br. at 41. They contend that, pretrial, the Government "repeatedly insist[ed] that Mr. Ashanti had come forward of his own accord" to recant his testimony regarding Sutherland. *Id.* Defendants assert that in fact the Government called the April 2011 meeting; that any testimony suggesting that Ashanti requested the meeting was incorrect and misleading; and that, in presenting such testimony from Agent Aldenberg, the Government knowingly used false testimony. Defendants argue that the allegedly false testimony was especially harmful to the defense: it "vouch[ed] both for Mr. Ashanti's credibility and the government's investigation techniques," which were crucial to the prosecution. *Id.* The District Court erred, they contend, in failing to prevent or cure the effect of the Agent Aldenberg testimony.

The record contains conflicting evidence regarding exactly how the April 2011 meeting came about: there are some indications that the Government and Ashanti met at Ashanti's sole insistence, and some that the meeting was proposed by the Government. Even so, as the District Court observed, this evidence gives us no basis to believe that the Government was untruthful in its account or the Government prompted or coached Ashanti at that meeting to recant his statements regarding Sutherland. *Cook*, 2019 WL 4247938, at *17. Indeed, at trial seven years later, in 2018, Ashanti expressly disavowed the latter suggestion. *Id.* The defense had ample opportunity to cross-examine both Ashanti and Agent Aldenberg regarding the reason for the meeting and to point out inconsistencies in their accounts. Defendants have not shown any persuasive reason to think that the likelihood of Defendant's conviction was altered by the misconduct they allege; regardless of whether the meeting occurred at the Government's or Ashanti's request, and acknowledging the inferences that might be hypothesized to flow from one account or the other, the import of Ashanti's recantation at that meeting overshadows those inferences. We see no basis for

concluding that any discrepancy regarding the meeting's origin "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process" and as to warrant a new trial. *Aquart*, 912 F.3d at 26.

### B. Agent James's Testimony

Defendants take issue with two pieces of Agent James's testimony. First, they argue that the Government was bolstering the validity of its own investigation when Agent James testified that, based on the information he had, "it made sense" for Desmond Wright's DNA to appear at the crime scene. Gov't App'x at 1619. Second, Defendants assail Agent James as vouching directly for the credibility of Jesus Ashanti when Agent James testified that he had independent knowledge regarding both Ashanti's concerns about Sutherland and why Ashanti originally implicated Sutherland.

Although "prosecutors may not vouch for their witnesses' truthfulness," the Government is permitted "to respond to an argument that impugns its integrity or the integrity of its case." *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005). "In a particular context . . . what might superficially appear to be improper vouching for witness credibility may turn on closer examination to be permissible reference to the evidence in the case." *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998).

That is what happened here. Regarding Defendants' first challenge: as the District Court determined, Agent James's testimony that it "made sense" for Wright's DNA to appear at the crime scene, Gov't App'x at 1619, "was merely a comment on the evidence already in the case and was not impermissible vouching for the government's theory" because the jury had already heard testimony that Desmond Wright was at the crime scene and touched the vehicle. *Cook*, 2019 WL 4247938, at *9.

Regarding Defendants' second challenge: even if Agent James's statement alluding to his prior knowledge of Ashanti's concerns about Sutherland gave indirect support to Ashanti's testimony, Agent James's statement did not "substantial[ly] prejudice" the proceedings. *Aquart*, 912 F.3d at 27. The District Court reasonably ruled that Agent James's "testimony does not inherently add credibility to Ashanti's statements that he falsely implicated Sutherland because he was afraid of him." *Cook*, 2019 WL 4247938, at *9.

18

Further, the District Court held that even if the testimony somehow bolstered Ashanti's credibility, "it did so to an inconsequential degree," particularly when "[t]he defense was free to, and certainly did, strenuously cross-examine Ashanti (and Agent James, for that matter) about Ashanti's reasons for implicating Sutherland and about Ashanti's admitted lies." *Id.* Moreover, Ashanti's reasons for recanting his testimony about Sutherland do not alter the fact that he changed his testimony or that he rescinded his incriminating statements against Sutherland but not against the rest of Defendants.

We therefore see no error in the District Court's ruling: any impropriety in Agent James's testimony did not rise to the level of prosecutorial misconduct and certainly did not result in "manifest injustice" requiring a new trial. *Archer*, 977 F.3d at 188.

### C. Admission of Rule 404(b) Testimony

Defendants next contend that the government impermissibly asked Ashanti about "other acts" evidence in violation of both Federal Rule of Evidence 404(b) and a pretrial ruling, and that, based on these violations, they are entitled to a new trial. Specifically, they submit that Ashanti testified that he had participated in robberies in the past with Mickens and Cook. That testimony, they argue, wrongfully implies a propensity for wrongdoing in these two Defendants.

Federal Rule of Evidence 404(b) provides in relevant part that "[e]vidence of any other crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admitted, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Before trial, Defendants moved to preclude evidence of the alleged shooting, robbery, and attempted kidnapping of Steven Keaton by Ashanti, Cook, Mickens, and Hunter, in 2008. Granting the motion, the District Court stated that to allow evidence of the Keaton incident would be "asking the jury to get emotional" and find that Defendants "are bad guys." *Cook*, 2019 WL 4247938, at *10. Further, the District Court disallowed Rule 404(b) evidence of other acts from the Government's case-in-chief, explaining "all [the

19

Government is] doing is suggesting to the jury these are bad guys who do this all the time." *Id.*

Despite these pretrial rulings, Ashanti's trial testimony touched on his involvement in prior robberies with Cook and Mickens. In particular, Ashanti testified (without objection from the defense) that Cook on one occasion called Ashanti to "come to the block," which Ashanti construed as meaning "[t]here was going to be a robbery." Gov't App'x at 872-73. At another point, Ashanti testified (also without objection) that Mickens sometimes would speak with a Jamaican accent "[d]uring a robbery, to hide his voice." Gov't App'x at 1020. Citing these statements, Defendants moved for a mistrial. They argued that in addition to violating the pretrial ruling, a reasonable juror could infer from this testimony that Defendants had committed prior robberies and improperly apply that inference to the current charges.

The District Court denied the motion for a mistrial, concluding that Ashanti's testimony did not "run afoul" of the court's pretrial ruling or of Rule 404(b) more generally. *Cook*, 2019 WL 4247938, at *10. The court explained that the pretrial ruling was focused on "precluding evidence of the Keaton incident, for which the defendants had never been charged"; prohibiting the Government from using "the Keaton incident . . . to bolster [Ashanti's] credibility with respect to the Teasley incident"; and preventing any evidence of prior acts from "unfairly prejudic[ing] the jury against the defendants and run[ning] the risk of the defendants being convicted as 'bad' people, rather than on the government's proof." *Id.* Having heard the question-and-answer firsthand, it summed up:

> Although both statements at issue implicate that last concern, neither was substantial enough to be prejudicial. The statement about Cook says nothing about his prior involvement in robberies, but only what Ashanti understood a comment to mean. At most, the testimony may suggest that *Ashanti* had taken part in robberies before, while saying nothing about Cook's history. Although slightly less innocuous, the statement about Mickens also does not necessarily imply that Mickens and Ashanti had participated in *other* robberies together. Regardless, though, it does not seem as though the government intentionally elicited either of the two statements from Ashanti. With respect to the comment about Cook, it seems clear that the government

> was intending to elicit from Ashanti that "the block" was Enfield Street. Further, with respect to the comment about Mickens, it seems clear that the government was intending to elicit from Ashanti that he was familiar with Mickens' voice.

*Id.* It also found no prejudice to Defendants from these comments, reasoning that "the evidence connecting both Cook and Mickens to the Teasley murder was substantial . . . and, therefore, there is no risk here that the jury convicted either of the defendants based upon two relatively minor comments, which were not objected to, made by Ashanti during hours of testimony." *Id.* at *11.

Ashanti's testimony did not expressly refer to the Keaton incident or tie Cook, Mickens, or Hunter directly to any uncharged robberies. Even if this testimony might have been properly excluded under Rule 404(b), in light of the other evidence against them, we cannot say that its admission was prejudicial.

### D. Alleged Burden-Shifting

Defendants fault the Government for its comments during closing that Ashanti was unlikely to fabricate his testimony that Cook, Mickens, and Hunter were involved in the criminal activity because any one of the Defendants could have had an alibi. Defendants emphasize that they had no obligation at all to provide an alibi or prove their innocence and argue that the Government's comment wrongly implies otherwise.

It is commonplace that, in pursuing a prosecution, the Government may not "comment on the failure of the defendant to testify . . . or suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatsoever." *United States v. Fell*, 531 F.3d 197, 221 (2d Cir. 2008). Still, "[a] prosecutor's commentary about a defendant's lack of evidence becomes prejudicial only if the jury would naturally and necessarily interpret the Government's summation as a comment on the defendant's failure to testify or if the evidence that the defendant has not produced was exclusively in his control." *Daugerdas*, 837 F.3d at 227.

The District Court concluded that although "the government's comments were 'close to the line,' this is not a situation in which the jury 'naturally and necessarily' would have interpreted the government's comments to be about the defendants' failure to testify or

21

failure to put forth an alibi, but simply a comment about Ashanti's testimony and what evidence the jury could use in assessing his credibility." *Cook*, 2019 WL 4247938, at \*12 (quoting *Daugerdas*, 837 F.3d at 227). The District Court pointed out that "[t]here was no argument by the government that the defendants should have put on an alibi defense." *Id.* The court further highlighted "the government's statements in its rebuttal argument that the defendants have no burden to put forth any evidence" and the court's multiple instructions to the jury "throughout the jury charge that the government has the burden in a criminal trial, not the defense." *Id.* at \*12-13.

We adopt the District Court's reasoned analysis of the Government's remarks during closing as intending to and having the natural effect only of supporting the credibility of Ashanti's testimony. Taken as a whole, the Government's comments fell far short of shifting the burden to Defendants to prove their innocence. Defendants do not carry the heavy burden of proving prosecutorial misconduct or manifest injustice warranting a new trial.

### E. Inviting Jury Speculation

#### 1. Testimony Regarding Kim Walton

Defendants next contend that the Government's rebuttal summation wrongfully invited the jury to speculate about the existence of evidence that was not admitted at trial and improperly accused the defense of keeping that evidence from the jury, thus irretrievably tainting the trial.

Specifically, Ashanti testified that Sutherland's wife, Kim Walton, worked at the Hartford Police Department and, through her job, could obtain addresses on behalf of Sutherland and others. When Ashanti was asked to elaborate, defense counsel objected, and Ashanti did not testify further on the subject. The court also sustained defense counsel's objection to Agent James's testimony that he had information about a person at the Hartford Police Station who had some involvement in the reasons that Ashanti falsely implicated Sutherland. During closing argument, Cook's defense counsel pointed out that there was no record evidence that Ms. Walton shared addresses from the Hartford Police Department database with anyone. In rebuttal summation, the Government attempted to refute this statement by commenting that "when the prosecution asked Mr. Ashanti what he

could tell you regarding Kim Walton, the defense objected to it and wouldn't permit the evidence to come in." Gov't App'x at 2142.

Defendants contend that this statement invited the jury to speculate about inadmissible evidence and accused the defense of hiding relevant evidence from the jury, improperly prejudicing the defense. Rejecting this contention, the District Court characterized the Government's remarks as "simply responding to an argument from the defendants that attempted to impugn the integrity of the government's case." *Cook*, 2019 WL 4247938, at *13.

We agree. The Government did not misstate the evidence, and it was entitled to respond to the defense's attempt to impugn the Government's case. Moreover, the question whether Ms. Walton was supplying Sutherland with addresses obtained from the Hartford Police Department database is tangential to the issue of Defendants' guilt or innocence in this case. Sufficient record evidence tied Defendants to the kidnapping, robbery, and murder of Teasley such that the Government's comment regarding the exclusion of evidence concerning Ms. Walton did not prejudice Defendants.

### 2. Closing Reference to Position of Front Passenger Seat

Mickens argues that a Government comment in closing—to the effect that someone could have adjusted the front passenger seat of Teasley's car after the shooting—was improper as lacking evidentiary support and was materially prejudicial to Mickens.

During the defense's closing, counsel for Mickens emphasized that when Teasley's car and body were found by the Hartford Police, the car's front passenger seat, which according to the prosecution was occupied by Mickens at some point during the evening, was positioned too far forward for Mickens, at 6 foot, 4 inches, to have occupied that seat, casting doubt on the Government's case. During rebuttal summation, the Government asserted, "[W]e just don't know from the evidence here who moved that seat and when." Gov't App'x at 2147. The Government referenced "testimony [from] the first responder to the scene [who] indicated that the paramedics were already there when he got there." *Id.* On appeal, Mickens argues that this claim misstated the record because Defense Exhibit 503, a photograph of the Acura TL interior, "shows blood splatter on the side of the center

23

console in an area that would have been covered by the passenger seat had it been pushed back at the time of the shooting." Mickens Br. at 53; *see also* Mickens App'x at 70. Mickens also contrasts the Government's comments about the passenger seat at closing with the testimony of Officer Rodney Gagnon that he prevented contamination of the crime scene after his arrival, including by preventing anyone from making changes to the interior of the car.

The District Court concluded that the Government "did not misstate the evidence, as Mickens suggests, but merely made a permissible reference to the evidence in the case." *Cook*, 2019 WL 4247938, at *14. The District Court observed that Officer Gagnon also testified that other people were on the scene when he arrived at around 11:30 a.m. on Monday, January 12, and that these included Desmond Wright (now deceased), who discovered the body. He also acknowledged that he did not "control who g[ot] to the scene before [him]," Gov't App'x at 213, and that the car looked different in the crime scene photos than when he arrived because a rear door that was open when he had arrived was closed in the photos. Further, Gagnon testified that EMTs arriving on the scene would have entered the vehicle "to determine whether or not the person laying in the back of the vehicle was deceased," and that "somebody was inside the vehicle also before the crime scene detectives arrived to work on the vehicle." *Id.* at 218-19.

Like the District Court, we conclude that the record contained competing evidence regarding whether and when the passenger seat was placed in a far-forward position. The Government had adequate support for its remark. Whether or not the jury accepted the proposition that Mickens was sitting in the front passenger seat during the crime, the record contained sufficient evidence for the jury to conclude that Mickens participated in the criminal scheme. Any marginal impropriety in the Government's remark during closing did not ultimately prejudice Mickens and does not warrant a new trial.

\* \* \*

24

We have considered Defendants' remaining arguments and find in them no basis for disturbing the District Court's rulings and judgments. We therefore AFFIRM the judgments of conviction as to Gerund Mickens, Terrell Hunter, and Harold Cook.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court